## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| **JAMES J. PALMIERI,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 04-138-P-S** |
| | ) | |
| **NYNEX LONG DISTANCE CO. , d/b/a** | ) | |
| **VERIZON ENTERPRISE SOLUTIONS,** | ) | |
| | ) | |
| **Defendant** | ) | |


### RECOMMENDED DECISION ON DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Defendant Nynex Long Distance Co., d/b/a Verizon Enterprise Solutions ("Verizon"), moves for summary judgment with respect to all four counts of former employee James J. Palmieri's complaint against it.  *See* Defendant's Motion for Summary Judgment, etc. ("Defendant's S/J Motion") (Docket No. 24) at 1; *see also* Complaint, included in Exh. A to Notice of Removal (Docket No. 1); First Amended Complaint (Docket No. 14) (together, "Complaint").  Palmieri concedes Verizon's entitlement to prevail with respect to Counts II and IV (alleging, respectively, violation of the Maine Prompt Pay Act, 26 M.R.S.A. § 626, and spoliation of evidence) but contends that triable issues of material fact preclude summary judgment with respect to Counts I and III (seeking unpaid overtime wages pursuant to, respectively, the Fair Labor Standards Act ("FSLA"), 29 U.S.C. § 207, and its Maine counterpart, 26 M.R.S.A. §§ 664(3) and 670).  *See* Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's S/J Opposition") (Docket No. 28) at 1-2; *see generally* Complaint.  For the reasons that follow, I recommend that Verizon's motion be granted in its entirety.

## I.  Summary Judgment Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(e).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at

their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted." (citations and internal punctuation omitted).

## II. Factual Context

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56 and viewed in the light most favorable to Palmieri as nonmovant, reveal the following relevant to this recommended decision:

For almost fifteen years Palmieri worked as a salesman with increasing levels of responsibility for Verizon, a large vendor of telecommunications products and services, and its corporate predecessors. Defendant Verizon Communications, Inc.'s Statement of Undisputed Material Facts Pursuant to Local Rule 56 ("Defendant's SMF") (Docket No. 25) ¶ 1; Plaintiff's Opposing Statement of Material Facts ("Plaintiff's Opposing SMF") (Docket No. 29) ¶ 1. He attended internal and external programs about sales skills and Verizon products. Defendant's SMF ¶ 2; Deposition of James J. Palmieri ("Palmieri Dep."), Attachment Nos. 3-4 to Plaintiff's Opposing SMF, at 64-68.[1] For example, in 1991 he attended an Alpha IV sales program that lasted thirteen weeks. Defendant's SMF ¶ 3; Plaintiff's Opposing SMF ¶ 3.

By 1997 Palmieri attained the position of account manager, later renamed corporate account manager 3 ("CAM 3"), which he held until his employment was terminated on August 26, 2002. *Id*. ¶ 4. Although there was a change in title, the responsibilities of the position remained the same. *Id*. ¶ 5. The job of CAM 3 was one of the highest level sales positions at Verizon, with those holding the position responsible for selling to a limited number of large customers. Defendant's SMF ¶ 6;

---

[1] Verizon characterizes Palmieri's training as "extensive" and states that he attended "many" such programs, *see* Defendant's SMF ¶ 2; however, Palmieri disputes that characterization, *see* Plaintiff's Opposing SMF ¶ 2; Palmieri Dep. at 65-69, and I view the cognizable evidence in the light most favorable to him.

Palmieri Dep. at 69-71.[2]  Palmieri sold products and services primarily associated with high-speed digital carrier services used to transfer voice and data.  Defendant's SMF ¶ 7; Plaintiff's Opposing SMF ¶ 7.  From August or September 1997 until January 2000, Palmieri was supervised by Jim Graul.  Plaintiff's Additional Facts ("Plaintiff's Additional SMF"), commencing at page 6 of Plaintiff's Opposing SMF, ¶ 69; Affidavit of James J. Palmieri ("Palmieri Aff."), Attachment No. 1 to Plaintiff's Opposing SMF, ¶ 6.  From January 2000 until his termination on August 26, 2002, he was supervised by Carol Levesque.  Plaintiff's Additional SMF ¶ 70; Palmieri Aff. ¶ 7.

During his entire employment at Verizon, Palmieri never requested overtime compensation or made a complaint about not receiving it.  Defendant's SMF ¶ 8; Palmieri Dep. at 109.[3]  Prior to joining Verizon he had held sales positions at other companies in the telecommunications industry and had never received overtime compensation in those positions.  Defendant's SMF ¶ 9; Plaintiff's Opposing SMF ¶ 9.  After leaving Verizon, he began working in a sales position at Choice One Communications ("Choice One") for which he does not receive and has not requested overtime pay.  Defendant's SMF ¶ 10; Palmieri Dep. at 15-16, 117.[4]

During his tenure as a CAM, Palmieri was assigned a module of customers to whom he was expected to sell Verizon products and services.  Plaintiff's Additional SMF ¶ 71; Defendant's Reply Statement of Material Facts Pursuant to Local Rule 56 ("Defendant's Reply SMF") (Docket No. 30) ¶ 71.  As an employee of Verizon, he was not permitted to call on customers who were not within his assigned module.  Plaintiff's Additional SMF ¶ 73; Palmieri Aff. ¶ 9.[5]  As a CAM 3, he was charged

---

[2] Palmieri qualifies this statement, noting that as a CAM 3 he held between twenty and fifty accounts.  *See* Plaintiff's Opposing SMF ¶ 6; Palmieri Dep. at 29.

[3] Palmieri qualifies this statement, asserting that he did not know at that time that he was entitled to overtime.  *See* Plaintiff's Opposing SMF ¶ 8; Palmieri Dep. at 109.

[4] Palmieri qualifies this statement, asserting that he is employed in a sales position at Choice One and is not required to take or respond to service calls.  *See* Plaintiff's Opposing SMF ¶ 10; Palmieri Dep. at 117.

[5] Verizon qualifies this statement, asserting in cognizable part that the customers in Palmieri's module did not stay constant from 1998 through August 2002.  *See* Defendant's Reply SMF ¶ 73; Palmieri Dep. at 29.

with making sales to a module of twenty to fifty large customer accounts.  Defendant's SMF ¶ 11; Palmieri Dep. at 29.[6]  His module included large organizations such as Northeast Utilities, L.L. Bean and the Maine Credit Union League.  Defendant's SMF ¶ 13; Plaintiff's Opposing SMF ¶ 13.  While Palmieri's smaller customers typically purchased $60,000 to $100,000 worth of Verizon products and services in a year, his larger customers purchased $800,000 to $1.5 million worth per year.  *Id*. ¶ 14. His sales quota grew from $1 million in 1998 to $5 million in 2002.  *Id*. ¶ 15.[7]  He sold "big deals," which represented eighty percent of the sales revenue for his module.  *Id*. ¶ 16.  He was responsible for all parts of the sales transactions, including face-to-face client meetings, contract negotiations and the signing of the sales contract.  *Id*. ¶ 17.  These large, complex sales took from six to eighteen months to develop and close and involved several data-gathering meetings as well as several feasibility-testing stages, a final proposal and contract negotiations.  Defendant's SMF ¶ 18; Palmieri Dep. at 35-36.[8]

Palmieri typically had to interact with three to ten different people at a customer during a deal. Defendant's SMF ¶ 19; Plaintiff's Opposing SMF ¶ 19.  These contacts included high-level employees such as the "MIS Director" and the chief information officer ("CIO").  *Id*. ¶ 20.[9]  Palmieri needed to make repeat sales to the same customers in his module.  *Id*. ¶ 21.  As one means of accomplishing this, he had quarterly meetings, or "planning sessions," with his customers.  *Id*. ¶ 22.[10] In these meetings, the MIS Director and the CIO stated their general needs and goals, and Palmieri

---

[6] As Palmieri points out, *see* Plaintiff's Opposing SMF ¶¶ 11-12, Verizon's further assertions that (i) his compensation depended significantly on meeting sales targets, *see* Defendant's SMF ¶ 11, and (ii) CAM 3s needed to build relationships with customers as a necessary predicate to making and retaining sales, *see id*. ¶ 12, are not supported by the citations given.  They are on that basis disregarded.

[7] Palmieri admits this statement but qualifies it by refuting any implication that the sales-quota growth was gradual, noting that his quota was $1.1 million or $1.2 million in 1999, $2.5 million to $3 million in 2001 and $5 million in 2002. *See* Plaintiff's Opposing SMF ¶ 15; Palmieri Dep. at 59-60.

[8] Palmieri qualifies this statement, noting that the sales cycle for a commodity product was approximately thirty to sixty days while that for complex data networks could take from six to eighteen months.  *See* Plaintiff's Opposing SMF ¶ 18; Palmieri Dep. at 35.

[9] Verizon does not explain what an "MIS Director" is; however, the omission is immaterial.

would attempt to sell solutions to satisfy them. *Id*. ¶ 23. Palmieri was expected to meet with each of the twenty to fifty customers in his module a minimum of once per quarter. *Id*. ¶ 24. When sales were negotiated, the meetings were more frequent. *Id*. ¶ 25. Palmieri also entertained the customers in his module. *Id*. ¶ 26. He occasionally had lunch or dinner with them and sometimes took them to Red Sox games and shows at the Wang Theater. *Id*. ¶ 27. He took advantage of these events to better position himself to make and retain sales to the customers in his module. *Id*. ¶ 28. If a sale was canceled by a customer, he would lose commission compensation that he had made on that sale. *Id*. ¶ 29.

Palmieri's base of operations at all times as an account manager or CAM was in Portland, Maine. Plaintiff's Additional SMF ¶ 74; Defendant's Reply SMF ¶ 74. Verizon compensated Palmieri, as a CAM 3, with a base salary that remained consistent throughout each year. Defendant's SMF ¶ 30; Plaintiff's Opposing SMF ¶ 30. For 1998-2002, his annual base salary ranged from about $55,000 to $65,000. *Id*. ¶ 31. He also earned sales commissions. Defendant's SMF ¶ 32; Palmieri Dep. at 50.[11] Verizon paid Palmieri $101,515.28 in 1998, $95,127.67 in 1999, $103,361.09 in 2000, $77,022.27 in 2001 and $33,164.22 for the first five months of 2002. Defendant's SMF ¶ 33; Plaintiff's Opposing SMF ¶ 33. He did not receive overtime pay. *Id*. ¶ 34. He and other CAM 3 salespeople set their own schedules based on their customers. *Id*. ¶ 35. Verizon's only guideline concerning the number of visits each CAM 3 would have with existing customers was once per quarter. *Id*. ¶ 36.[12] As to scheduling, Palmieri testified as follows:

Q        – is that correct? What was your – schedule, your time schedule?

---

[10] I have worded this statement to reflect Palmieri's qualification. *See* Plaintiff's Opposing SMF ¶ 22; Palmieri Dep. at 38.

[11] Palmieri acknowledges that his sales commissions represented forty to forty-five percent of his earnings in 1998 and 2000, approximately thirty percent in 1999 and less than twenty percent in 2001. *See* Plaintiff's Opposing SMF ¶ 32; Palmieri Dep. at 57-58, 62-63. By my calculations, these percentages are accurate save for the 1999 percentage, which I calculate as approximately thirty-seven percent (predicated on a base salary of $59,900 and total compensation of $95,127.67).

[12] I have worded this statement to reflect that portion of Palmieri's qualification that I find to be supported by the citation given. *See* Plaintiff's Opposing SMF ¶ 36; Palmieri Dep. at 42-43.

> A    We – we approached – I approached my job as an entrepreneur. This was my business, these were my customers, and I took full responsibility for that. And as such, I would put in the amount of time necessary to keep my customers happy as if they were my business.

*Id*. ¶ 37.   Verizon also placed few controls over Palmieri's places of work and had minimum involvement with how he actually built the relationships with, and sold to, the customers in his module. *Id*. ¶ 38.   Palmieri testified:

> Q    When you – during the course of your time at Verizon, was there a – in the Portland office, was it a formal atmosphere or an informal atmosphere?
>
> A    I would say it was informal. It did migrate towards an informal atmosphere.
>
> Q    And when you say informal, what do you mean by that?
>
> A    I meant people that – we wouldn't be wearing suits and ties every day. People were pretty much entrepreneurial; you ran your own end of the business, you did what was required to meet customer needs, you did what needed to be done that way. There was no – you didn't observe a military chain of command. You often skipped levels in escalations. Those type of informalities are what I am referring to.

*Id*.   Palmieri was solely responsible for establishing the strategic, *i.e*., sales generating, aspects of his accounts. *Id*. ¶ 39.   He determined the method and approach to grow his module to produce further revenue. Defendant's SMF ¶ 40; Palmieri Dep. at 24-25.[13]   From 2000 through 2002 Palmieri's supervisor, Carol Levesque, was located in New Hampshire, more than one hundred miles away from him. Defendant's SMF ¶ 41; Plaintiff's Opposing SMF ¶ 41.   Palmieri testified that he met with Levesque only once per month, and she accompanied him on only one visit to a single customer once per quarter. Defendant's SMF ¶ 42; Palmieri Dep. at 25, 28.[14]

---

[13] Palmieri qualifies this statement, asserting that he did have supervision and had sales quotas imposed upon him. *See* Plaintiff's Opposing SMF ¶ 40; Deposition of Carole D. Levesque ("Levesque Dep."), Exh. A to Defendant's Reply SMF, at 26-27.

[14] Palmieri qualifies this statement, asserting that he spoke with Levesque at least daily in most cases. *See* Plaintiff's Opposing SMF ¶ 42; Palmieri Dep. at 25.

During the period that Palmieri was a CAM 3, Verizon maintained a multi-tiered account team to address customer-service issues. Defendant's SMF ¶ 44; Deposition of Thomas Romano ("Romano Dep."), Attachment Nos. 7-8 to Plaintiff's Opposing SMF, at 13-15.[15] Positions within the account team were designated to assist with the technical and administrative aspects of a sale, billing, maintenance and implementation. Defendant's SMF ¶ 45; Plaintiff's Opposing SMF ¶ 45. These positions included sales engineer, specialist, network services manager, service representative ("Rep") and central-office technician ("Tech"). *Id.* Customers with a service issue first reported the problem to a Tech at the Trouble Center. *Id.* ¶ 46. A Tech was available by telephone around the clock. *Id.* ¶ 47. Techs were responsible for receiving the complaint from the customer and dispatching resources to fix the problem. Defendant's SMF ¶ 48; Romano Dep. at 14.[16] Customers also could contact the network service manager. Defendant's SMF ¶ 49; Plaintiff's Opposing SMF ¶ 49.[17] The network service manager carried a beeper and was also available around the clock. *Id.* ¶ 50. He or she could manage the problem and stay in contact with the customer. Defendant's SMF ¶ 51; Romano Dep. at 22.[18] The customer-service organization at Verizon was responsible for implementation of complex matters, including installation, service delivery and handling of technical trouble reports. Plaintiff's Additional SMF ¶ 118; Defendant's Reply SMF ¶ 118.

Following the 1998 merger with Bell Atlantic, a number of service positions were eliminated, necessitating that Palmieri spend increasing time on service issues and implementation scheduling.

---

[15] Palmieri qualifies this statement, asserting that although there was such a team, he was forced to spend seventy percent of his time on customer-service issues. *See* Plaintiff's Opposing SMF ¶ 44; Palmieri Dep. at 74-75, 78. However, the citations given do not support his assertion that he was "forced" to do so, and that portion of the statement is disregarded on that basis.

[16] Palmieri qualifies this statement, asserting that subsequent to Verizon's merger with Bell Atlantic in 1998, he would receive the customer-service complaint and proceed to manage the service problem until it was fixed. *See* Plaintiff's Opposing SMF ¶ 48; Palmieri Dep. at 111-13. While, in the cited deposition testimony, Palmieri is recorded as having stated that the merger occurred in "1988," Palmieri Dep. at 111, there appears to be no dispute that it occurred in 1998.

[17] I have worded this statement to reflect Palmieri's qualification. *See* Plaintiff's Opposing SMF ¶ 49; Romano Dep. at 22.

[18] Palmieri denies this statement, essentially on the basis that certain portions are not supported by the citation given. *See* Plaintiff's Opposing SMF ¶ 51. I include only such portions as I find to be fairly supported by that citation.

9

Plaintiff's Additional SMF ¶ 75; Palmieri Dep. at 39.[19]  Following this merger, Palmieri's primary function at Verizon was ensuring that service was delivered to his customers.  Plaintiff's Additional SMF ¶ 76; Palmieri Dep. at 38-40.[20]  Although the described duties of a CAM were strictly sales, at least seventy percent of Palmieri's daily activities concerned customer-service-related issues. Plaintiff's Additional SMF ¶ 106; Palmieri Dep. at 74-77.[21]

Palmieri's supervisor, Levesque, counseled him on two or three occasions to see customers more frequently.  Plaintiff's Additional SMF ¶ 78; Palmieri Dep. at 43-44.  Levesque assigned Palmieri customers who had services sold to them by other CAMs and who had significant service-related issues.  Plaintiff's Additional SMF ¶ 81; Palmieri Aff. ¶¶ 11-23.[22]  Several of these accounts were not legitimate prospects for future sales.  Plaintiff's Additional SMF ¶ 83; Palmieri Aff. ¶ 12.[23] Each of these accounts had significant and problematic service histories.  Plaintiff's Additional SMF ¶ 84; Palmieri Aff. ¶ 13.  Service, which was the maintenance and repair of Verizon telecommunication products and services, was the responsibility of the Verizon Network Operations Division.  Plaintiff's Additional SMF ¶ 85; Palmieri Aff. ¶ 14.

In January or February 2000, Levesque assigned Palmieri an account known as Public Service of New Hampshire.  Plaintiff's Additional SMF ¶ 86; Palmieri Aff. ¶ 15.[24]  This was the first time

---

[19] Verizon denies this statement, *see* Defendant's Reply SMF ¶ 75; however, I view the cognizable evidence in the light most favorable to Palmieri.  While the citation given by Palmieri does not support his assertion that the merger occurred in 1998, there appears to be no dispute about that fact, and so I have included it.

[20] Verizon denies this statement, *see* Defendant's Reply SMF ¶ 76; however, I view the cognizable evidence in the light most favorable to Palmieri.

[21] Verizon qualifies this statement, asserting that it had a customer-service organization responsible for taking care of service issues, and Palmieri opted to involve himself in service issues.  *See* Defendant's Reply SMF ¶ 106; Romano Dep. at 40.  Although Palmieri's citation does not support the seventy-percent figure, there is no dispute that this is indeed the amount of time he claims to have spent on customer-service issues.  *See* Defendant's SMF ¶ 58; Plaintiff's Opposing SMF ¶ 58.

[22] Verizon qualifies this and other statements, asserting that Palmieri identified only three such accounts assigned to him by Levesque over a two-year period and that he always had a hope of selling to these newly assigned accounts.  *See* Defendant's Reply SMF ¶¶ 81-82, 84; Palmieri Aff. ¶¶ 11-23; Palmieri Dep. at 49.

[23] Verizon denies this statement, *see* Defendant's Reply SMF ¶ 83; however, I view the cognizable evidence in the light most favorable to Palmieri.

[24] Verizon qualifies this statement, asserting that Palmieri's customer was Northeast Utilities, which was affiliated with Public Service of (*continued on next page*)

during his employment that Palmieri was assigned an account outside of Maine.  Plaintiff's Additional SMF ¶ 87; Defendant's Reply SMF ¶ 87.  The account had been assigned no sales representative for the previous nine months, and had been receiving assistance for a variety of service-related issues, including service outages.  Plaintiff's Additional SMF ¶ 88; Palmieri Aff. ¶ 17.[25]  As part of his responsibility for that account, Palmieri was required to attend monthly service meetings with members of Verizon's Network Operations Division.  Plaintiff's Additional SMF ¶ 89; Palmieri Aff. ¶ 18.[26]  These meetings dealt exclusively with service problems, including service outages and plans to develop resolutions to those problems as formulated by representatives of the Network Operations Division.  *Id*.  It was beyond Palmieri's authority to develop resolutions to these service problems. Plaintiff's Additional SMF ¶ 90; Palmieri Aff. ¶ 19.[27]  In dealing with network operations Palmieri advocated for his customers, but he did not assign work or determine the remedy to be employed for the particular service problem.  Plaintiff's Additional SMF ¶ 91; Palmieri Aff. ¶ 20.  From January 2000 until Palmieri's termination in August 2002, and despite his regular efforts, Public Service of New Hampshire purchased no new products or services from him or any other member of Verizon's sales force.  Plaintiff's Additional SMF ¶ 92; Palmieri Aff. ¶ 21.[28]

In 2000 Palmieri was assigned another account in New Hampshire called Destek.  Plaintiff's Additional SMF ¶ 93; Palmieri Aff. ¶ 22.[29]  Destek was an internet services provider in Nashua, New

---

New Hampshire.  *See* Defendant's Reply SMF ¶ 86; Levesque Dep. at 31-32.

[25] Verizon qualifies this statement, noting that (i) it had a customer-service organization in place to take care of those issues, and (ii) Palmieri conceded that Public Service of New Hampshire had been receiving assistance for these service issues before he became involved.  *See* Defendant's Reply SMF ¶ 88; Romano Dep. at 40; Palmieri Aff. ¶ 17.

[26] Verizon denies paragraph 89 of the Plaintiff's Additional SMF, *see* Defendant's Reply SMF ¶ 89; however, I view the cognizable evidence in the light most favorable to Palmieri.

[27] Verizon qualifies this and other paragraphs of the Plaintiff's Additional SMF by noting that it had a customer-service organization responsible for taking care of service issues.  *See* Defendant's Reply SMF ¶¶ 90, 95-96.

[28] Verizon qualifies this statement, asserting that Palmieri always hoped to sell to this account.  *See* Defendant's Reply SMF ¶ 92; Palmieri Dep. at 49.

[29] Verizon denies paragraph 93 of the Plaintiff's Additional SMF, *see* Defendant's Reply SMF ¶ 93; however, I view the cognizable evidence in the light most favorable to Palmieri.

Hampshire.  *Id*.  It demanded constant attention from Palmieri related to service interruptions and Verizon billing mistakes.  *Id*.  It was suing Verizon at the time and did not buy any new services from Palmieri.  *Id*.  Later in 2000, Levesque assigned Palmieri the Laconia Savings Bank ("Laconia") account.  Plaintiff's Additional SMF ¶ 94; Palmieri Aff. ¶ 23.  About one month before this account was assigned to Palmieri, Laconia had a service interruption for several days.  *Id*.  Shortly after being assigned this account Palmieri, accompanied by Levesque, met with Laconia representatives.  Plaintiff's Additional SMF ¶ 95; Palmieri Aff. ¶ 24.  Those representatives advised Palmieri and Levesque that Laconia had no intention of purchasing any additional Verizon products or services but required Verizon's continued presence in order to address their significant service difficulties.  *Id*.

Following this meeting, Palmieri addressed with Levesque the problem of his maintaining a New Hampshire account in his module that had no legitimate prospects for future sales.  Plaintiff's Additional SMF ¶ 96; Palmieri Aff. ¶ 25.  Nevertheless, this account remained within Palmieri's module of accounts until his termination and during this period required his regular attention to service-related issues.  *Id*.

In late 2001 or early 2002 Levesque assigned Palmieri two additional New Hampshire accounts, Frisbee Memorial Hospital and Wentworth-Douglas Hospital.  Plaintiff's Additional SMF ¶ 97; Defendant's Reply SMF ¶ 97.  Both accounts had histories of significant data-service problems.  Plaintiff's Additional SMF ¶ 98; Palmieri Aff. ¶ 27.  Both accounts required Palmieri's regular and frequent attention to address their customer-service needs, and neither would entertain the possibility of purchasing additional Verizon products or services.  Plaintiff's Additional SMF ¶ 99; Palmieri Aff. ¶ 28.[30]  In addition to these accounts, Palmieri had many other accounts, including L.L. Bean, the

---

[30] Verizon denies this statement, *see* Defendant's Reply SMF ¶ 99; however, I view the cognizable evidence in the light most favorable to Palmieri.

Maine Credit Union League, Maine Medical Center and others, that required him to devote significant time and attention to service-related issues.  Plaintiff's Additional SMF ¶ 100; Palmieri Aff. ¶ 29.[31]

From the time Verizon merged with Bell Atlantic in 1998, Palmieri was spending at least seventy percent of his time addressing customer-service needs, and was thereby precluded from devoting the necessary time to generating sales with his existing customers.  Plaintiff's Additional SMF ¶ 101; Palmieri Aff. ¶ 30.[32]  These time concerns were regularly addressed with Palmieri's supervisory personnel; however, no changes were made to his module of accounts, and no steps were taken to reduce the time he was required to spend on service and service-related issues.  Plaintiff's Additional SMF ¶ 102; Palmieri Aff. ¶ 31.[33]  Palmieri was forced to remain in the office to deal efficiently with customer-service issues.  Plaintiff's Additional SMF ¶ 103; Palmieri Aff. ¶ 32.[34]  It was the only means by which he could receive/make calls from customers and receive/make calls to the Network Operations Center.  *Id*.  Palmieri had a sales quota of $5 million in 2002, which was not realistic.  Plaintiff's Additional SMF ¶ 107; Palmieri Dep. at 82.  His module of accounts never had supported sales in excess of $1 million.  *Id*.  From August 2001 through August 2002, he spent less than fifty percent of his time on outside sales.  Plaintiff's Additional SMF ¶ 108; Palmieri Dep. at 83.[35]

Palmieri testified that his schedule "was dictated by the customers."  Defendant's SMF ¶ 59; Palmieri Dep. at 47.[36]  Palmieri tried to maintain his relationships with his customers by providing

---

[31] Verizon denies this statement, *see* Defendant's Reply SMF ¶ 100; however, I view the cognizable evidence in the light most favorable to Palmieri.

[32] Verizon qualifies this statement, asserting that it had a customer-service organization responsible for taking care of service issues, and Palmieri opted to involve himself in such issues.  *See* Defendant's Reply SMF ¶ 101; Romano Dep. at 40.

[33] Verizon denies this statement, *see* Defendant's Reply SMF ¶ 102; however, I view the cognizable evidence in the light most favorable to Palmieri.

[34] Verizon denies this statement, *see* Defendant's Reply SMF ¶ 103; however, I view the cognizable evidence in the light most favorable to Palmieri.

[35] Verizon qualifies this statement, noting that Palmieri testified that during the last year of his employment he spent less than fifty percent of his time outside the office with customers.  *See* Defendant's Reply SMF ¶ 108; Palmieri Dep. at 83.

[36] Palmieri qualifies this statement, asserting that his schedule was dictated by complaints concerning service and service-related issues from customers.  *See* Plaintiff's Opposing SMF ¶ 59; Palmieri Dep. at 47.

good service.  Defendant's SMF ¶ 61; Plaintiff's Opposing SMF ¶ 61.  All of the customers he assisted with problems were in his sales module.  *Id*. ¶ 62.  He had made sales to some of these customers and hoped to make additional sales to them in the future.  Defendant's SMF ¶ 63; Palmieri Dep. at 40, 48.[37]  In responding to a customer call concerning a service-related issue, Palmieri dropped everything, including sales activities, in order to contact the personnel at the Network Operations Center and get the appropriate personnel to address the service-related issues.  Plaintiff's Additional SMF ¶ 113; Palmieri Dep. at 111-13.  In his current employment with Choice One, Palmieri does not receive calls pertaining to service-related issues.  Plaintiff's Additional SMF ¶ 114; Palmieri Dep. at 117.  Palmieri played an active role in service-related issues and was more deeply involved than other CAMs.  Plaintiff's Additional SMF ¶ 115; Romano Dep. at 69.

Palmieri completed sign-out sheets whenever he left the office during the period from 1998 through August 2001, which would show how much time he spent inside the office and how much time he spent outside the office.  Plaintiff's Additional SMF ¶ 110; Palmieri Dep. at 85-86.  He was required to fill out time sheets demonstrating hours worked and was told to put only eight hours per day and forty hours per week.  Plaintiff's Additional SMF ¶ 111; Palmieri Dep. at 89-91.[38]  He recorded in his own calendar hours worked in excess of eight per day and forty per week because supervisor Graul stated that the CAMs were not working hard enough.  Plaintiff's Additional SMF ¶ 112; Palmieri Dep. at 108.

In May 2002 Palmieri took a leave of absence and stopped performing services for Verizon.  Defendant's SMF ¶ 64; Plaintiff's Opposing SMF ¶ 64.  His employment was terminated on August

---

[37] Palmieri qualifies this statement, asserting that toward the latter part of 2001 and into 2002, he was receiving calls from new customers concerning service issues arising from services sold by other CAMs.  *See* Plaintiff's Opposing SMF ¶ 63; Palmieri Dep. at 48-49.

[38] Verizon denies this statement, *see* Defendant's Reply SMF ¶ 111; however, I view the cognizable evidence in the light most favorable to Palmieri.

26, 2002.  *Id*. ¶ 65.  More than two years after he stopped performing services for Verizon, he filed this lawsuit on June 7, 2004.  *Id*. ¶ 66.

John Clifford is a Verizon regional sales manager responsible for managing CAMs.  Plaintiff's Additional SMF ¶ 119; Defendant's Reply SMF ¶ 119.  He was designated by Verizon to testify on a number of issues pursuant to a Notice of Deposition served on Verizon.  *Id*. ¶ 120.  He was specifically designated to speak on behalf of Verizon with respect to Items 3, 4 and 5 and a portion of Items 6 and 8 of the Notice of Deposition.  *Id*. ¶ 121.  Paragraph 5 of that notice required Clifford to testify on "all facts and circumstances concerning the classification of Plaintiff's position as exempt from overtime under any of the exemptions claimed by Defendant, including, but not limited to[,] studies, audits, or assessments which led to[,] support or contradict this classification at any time from 1990 to the present."  *Id*. ¶ 122.  Clifford never supervised Palmieri or anyone who was Palmieri's supervisor.  Plaintiff's Additional SMF ¶ 123;  Rule 30(b)(6) Deposition of Verizon through its designee John Clifford ("Clifford Dep."), Attachment Nos. 5-6 to Plaintiff's Opposing SMF, at 9.[39] Clifford has received no training pertaining to classification of an employee as exempt or non-exempt for purposes of receiving overtime compensation.  Plaintiff's Additional SMF ¶ 124; Clifford Dep. at 12.[40]  Clifford was not familiar with the twenty-percent rule as it pertained to overtime exemptions and was unaware of any importance to the distinction between inside and outside sales.  Plaintiff's Additional SMF ¶¶ 126-27; Clifford Dep. at 20.[41]

---

[39] Verizon qualifies this statement, asserting that Clifford supervised people who supported Palmieri's sales effort, but never was in Palmieri's unit.  *See* Defendant's Reply SMF ¶ 123; Clifford Dep. at 10.

[40] Verizon qualifies this statement, noting that Clifford testified that he received no formal training but was knowledgeable about the various duties performed by CAMs and followed industry studies indicating that CAMs are universally exempt from overtime.  *See* Defendant's Reply SMF ¶ 124; Clifford Dep. at 12-13, 18.

[41] Verizon denies these statements, *see* Defendant's Reply SMF ¶ 126-27; however, I view the cognizable evidence in the light most favorable to Palmieri.  A further assertion by Palmieri that Clifford had an inadequate understanding of the law pertaining to overtime exemption and was not familiar with the law, *see* Plaintiff's Additional SMF ¶ 125, is disregarded on the basis that it is not fairly supported by the citation given.

Clifford testified that he believed Palmieri was overtime-exempt because "he had a defined module of accounts, so it was to drive sales and revenues to those accounts. It was a situation where, you know, it was very much a high-level salesperson, a well-paid salesperson kind of the high-end spectrum of the sales positions, somebody who comes in and is self-directed leads the team to drive sales." Plaintiff's Additional SMF ¶ 128; Clifford Dep. at 27-28.[42]

### III. Analysis

Verizon seeks summary judgment with respect to Palmieri's federal overtime-pay claim (Count I) on three alternative bases: that (i) the claim is barred by the applicable statute of limitations, (ii) the outside-sales exemption applies, and (iii) the administrative exemption applies. *See* Defendant's S/J Motion at 1. It seeks summary judgment with respect to his state overtime-pay claim (Count III) on the alternative bases that (i) it did not substantially control Palmieri's work hours and locations (as a result of which Maine's overtime laws are not applicable), and (ii) the administrative exemption applies. *See id.* I agree with Verizon that Palmieri's federal claim is time-barred and, in any event, his situation fits within the parameters of the federal outside-sales exemption. I also concur with Verizon's premise that it did not substantially control Palmieri's work hours and locations, entitling it to summary judgment with respect to his state claim. I need not and do not reach its argument that the administrative exemption likewise applied.

---

[42] Verizon qualifies this statement, asserting that Clifford also testified that Palmieri's position involved "very large . . . high-ticket sales" and "requires a true professional, with extensive experience, broad base of knowledge, to come in and lead a team to drive big sales[.]" Defendant's Reply SMF ¶ 128; Clifford Dep. at 12-13. Verizon also points out that, in addition, Clifford indicated that CAMs at Verizon had "extensive experience, you know, educational requirements, a lot of technical knowledge, industry knowledge, and certainly product and competitive knowledge." Defendant's Reply SMF ¶ 128; Clifford Dep. at 15. Finally, Verizon notes, Clifford stated that Verizon had done industry studies indicating that CAMs are universally exempt from overtime. *See* Defendant's Reply SMF ¶ 128; Clifford Dep. at 18.

## A.  Federal Claim: Statute of Limitations

As both parties recognize, *see id.* at 12; Plaintiff's S/J Opposition at 8-9, the statute of limitations for overtime-pay claims pursuant to the FLSA is two years from the date of accrual of the cause of action unless a plaintiff can demonstrate a "willful violation" – a circumstance that extends it to three years, *see* 29 U.S.C. § 255(a).  There is no dispute that Palmieri filed the instant action more than two years after he last performed services for Verizon.  Therefore, the action is time-barred unless he can prove a willful violation.

"[I]n order to establish a willful violation of the FMLA, a plaintiff must show that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 33 (1st Cir. 2003) (citation and internal quotation marks omitted).  "If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful." *Id*. (citation and internal quotation marks omitted). However, even if an employer acts unreasonably in determining that obligation, its conduct still should not be deemed willful so long as it did not act recklessly in so doing. *See id*.

Palmieri posits that a reasonable fact-finder could conclude that Verizon committed a willful violation inasmuch as:

1.      It directed him to record only forty hours a week on his time sheets, from which inferences can be drawn of (i) awareness of its overtime obligations and (ii) an effort to avoid them. *See* Plaintiff's S/J Opposition at 9.

2.      Its Rule 30(b)(6) deponent, John Clifford, displayed little knowledge of overtime-compensation law or its application to Palmieri's circumstances, in particular. *See id*. at 9-11. "Viewing the evidence in the light most favorable to the non-moving party, reasonable minds could

conclude that Defendant's failure to analyze the issue entirely demonstrates a reckless disregard for its obligations under the FLSA." *Id*. at 11.

Palmieri overstates his case. While Clifford had not received formal training in this area and was unfamiliar with certain aspects of applicable law, he did testify that Verizon (i) was aware of studies showing CAMs to be "universally exempt" from overtime and (ii) regarded CAMs such as Palmieri, who were well-paid, high-level salespeople, as fitting the contours of the "sales" exemption. This was not an unreasonable – let alone a reckless – assessment. As discussed below, I conclude that during his tenure at Verizon Palmieri was classifiable as an overtime-exempt outside salesman. While Verizon evidently did not perform this particularized analysis during Palmieri's employment, it had no reason to do so. He never challenged his classification as overtime-exempt during that time frame. In any event, the Supreme Court rejected an "alternative standard for willfulness that would have made the issue in most cases turn on whether the employer sought legal advice concerning its pay practices." *Hanger v. Lake County*, 390 F.3d 579, 584 (8th Cir. 2004) (citation and internal quotation marks omitted). "The Court rejected this alternative standard because an employer's decision not to seek legal advice could result from negligence or a good-faith, incorrect assumption about a statute's applicability just as easily as it could result from recklessness." *Id*.

Nor does Verizon's direction to Palmieri to record only forty hours on his time sheet alter the overall picture. A fact-finder could not draw a reasonable inference, in the circumstances of this case, that this directive resulted from an awareness of a possible overtime obligation to Palmieri and a desire to evade that obligation. Verizon's Rule 30(b)(6) deponent testified that the company believed, based on industry studies, that these highly compensated individuals were overtime-exempt. There is no evidence that anyone (including Palmieri) put Verizon on notice during the time frame of his employment that this belief was mistaken.

Inasmuch as Palmieri falls well short of demonstrating the existence of a triable issue whether Verizon willfully violated the FLSA, his federal claim (Count I) is time-barred.

## B.  Federal Claim: Outside-Sales Exemption

Even assuming *arguendo* that Palmieri's federal claim was not time-barred, I conclude that Verizon nonetheless would be entitled to summary judgment on the basis that it demonstrates the applicability of the outside-sales exemption.

As the First Circuit has recently summarized:

> The FLSA's overtime provisions establish the general rule that employees must be compensated at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours.  But [certain employees] are exempt from this requirement.  The employer in an FLSA case bears the burden of establishing that its employees are exempt, and because of the remedial nature of the FLSA, exemptions are to be narrowly construed against the employers seeking to assert them.

*De Jesús-Rentas v. Baxter Pharm. Servs. Corp.*, No. 03-2679, 2005 WL 546020, at *2 (1st Cir. Mar. 9, 2005) (citations and internal quotation marks omitted); *see also, e.g., Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 7 (1st Cir. 1997) ("[T]he remedial nature of the statute  requires that FLSA exemptions be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.") (citation and internal quotation marks omitted).

Employees categorized as exempt include "any employee employed . . . in the capacity of outside salesman (as such term [is] defined and delimited from time to time by regulations of the Secretary [of Labor]."  29 U.S.C. § 213(a)(1).  If the three-year statute of limitations applied, Palmieri would have a cause of action for violations that occurred from June 7, 2001 through the time he last performed services for Verizon in May 2002.  Accordingly, regulations in effect during that time frame apply.  *See, e.g., Clark v. United Emergency Animal Clinic, Inc*., 390 F.3d 1124, 1125 n.1 (9th Cir.

2004) (citing to statutory and regulatory overtime-pay provisions in effect during plaintiffs'

employment).

During the relevant period, applicable regulations defined an "outside salesman" as any

employee:

> (a)  Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in:
>
> (1)  Making sales within the meaning of section 3(k) of the act,[43] or
>
> (2)  Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (b)  Whose hours of work of a nature other than that described in paragraph (a)(1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer; Provided, That work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

29 C.F.R. § 541.5 (2002).  The regulations further provided:

> Work performed "incidental to and in conjunction with the employee's own outside sales or solicitation" includes not only incidental deliveries and collections which are specifically mentioned in § 541.5(b), but also any other work performed by the employee in furthering his own sales efforts.  Work performed incidental to and in conjunction with the employee's own outside sales or solicitations would include, among other things, the writing of his sales reports, the revision of his own catalog, the planning of his itinerary and attendance at sales conferences.

*Id*. § 541.503 (2002).

Verizon argues that all three prongs of the outside-sales test were met inasmuch as:

---

[43] This is a reference to 29 U.S.C. § 203(k), which at all relevant times defined "sale" as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  29 U.S.C. § 203(k).  The Secretary of Labor further glossed the concept as follows: "Generally speaking, the divisions have interpreted section 3(k) of the Act to include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Thus sales of automobiles, coffee, shoes, cigars, stocks, bonds, and insurance are construed as sales within the meaning of section 3(k)."  29 C.F.R. § 541.501 (2002).

1.      There is no dispute that Palmieri, who among other things was given a sales quota and derived a substantial portion of his compensation from sales commissions, was employed for the purpose of making sales.  *See* Defendant's S/J Motion at 14-15.

2.      Palmieri was regularly engaged away from Verizon's place of business, having testified to the occurrence of multiple customer meetings outside of Verizon's offices.  *See id.* at 15.

3.      The time Palmieri spent dealing with customer-service issues was "incidental to and in conjunction with" his own outside sales in that (i) he was responsible for complex, high-end sales, (ii) in order to sell at that high level, he needed to build and cultivate a relationship with his customers, and one way of accomplishing that was to attend to customer-service issues, (iii) he addressed only customer-service issues of customers assigned to his module, and (iv) he hoped to make sales to these customers in the future.  *See id.* at 15-17.

Palmieri does not directly dispute Verizon's assertion that it carries its burden with respect to the first two prongs of the outside-sales test.  *See* Plaintiff's S/J Opposition at 11-14.  Nonetheless, in an argument that implicates those prongs, he asserts that consideration of certain relevant factors creates a triable issue whether he functioned as an outside salesman for purposes of the FLSA exemption.  *See id.* at 12; *see also, e.g., Fields v. AOL Time Warner, Inc.*, 261 F. Supp.2d 971, 974 (W.D. Tenn. 2003) ("Courts have articulated additional factors that are probative of an employee's status as an outside salesman.  Among these factors, a court may consider whether the employee 1) must solicit new business, 2) receives sales training, and 3) was hired and denominated as a salesman.").  Specifically, he asserts that the following facts cut against a finding that he was an outside salesman: that (i) he was assigned a stable of clients, rather than being free to generate his own list of customers, (ii) he received little, if any, sales training, and (iii) he was required to spend

upwards of seventy percent of his work day addressing service problems that did not have the promise of a sale at the end of the day.  *See* Plaintiff's S/J Opposition at 12-13.

Inasmuch as appears, neither the First Circuit nor this court has had occasion to consider which factors are relevant to whether an employee properly is categorized as an outside salesman for FLSA purposes.  However, in a thoughtful discussion, the United States District Court for the Western District of Michigan observed that there are relevant factors in addition to those enumerated in *Fields* and that none of these factors should be viewed in isolation:

> Other indicia of sales-related activities [besides those catalogued in *Fields*], . . . include commission compensation, specialized sales training, and lack of direct or constant supervision.  In deciding whether an employee is an outside salesperson, the Court must look beyond labels and descriptions and also inquire into the particular facts of the actual work performed.  None of the indicia of sales-relatedness can be considered in isolation.  Instead, the Court must consider the totality of the circumstances in a task-related context.
> .

*Nielsen v. Devry, Inc*., 302 F. Supp.2d 747, 756 (W.D. Mich. 2003) (citations omitted).

While Palmieri was precluded from seeking out new clients, clearly he was expected to generate new sales from his assigned client base.  I am at a loss to see why this would not constitute the solicitation of "new business."  Beyond this, the caselaw indicates that an employer may impose some controls on the client base – such as relegation to a certain sales territory – without transforming the character of an employee as an outside salesman for purposes of the federal overtime exemption. *See, e.g., Hodgson v. Krispy Kreme Doughnut Co*., 346 F. Supp. 1102, 1103-04 (M.D.N.C. 1972) (deeming as "outside salesmen" route salesmen who, *inter alia*, were responsible within assigned territories for obtaining new regular customers, keeping and serving old regular customers and developing additional sales to established regular customers).

In any event, even assuming *arguendo* that Verizon's constraint against Palmieri's solicitation of new clients militates against a finding that Palmieri was an outside salesman, consideration of the remaining relevant factors strongly points in the direction of a finding that he was:

1.      There is no dispute that Palmieri was hired and denominated as a salesman. *See, e.g.*, Defendant's SMF ¶ 1; Plaintiff's Opposing SMF ¶ 1 ("For almost 15 years, Plaintiff worked as a sales person with increasing levels of responsibility for Verizon[.]").

2.      While the parties clash in their characterizations of the quantity of specialized sales training Palmieri received, *compare, e.g.*, Defendant's SMF ¶ 2 ("extensive") *with* Plaintiff's Opposing SMF ¶ 2 ("minimal"), there is no dispute that he did receive such training during the course of his lengthy career with Verizon – for example, attending a thirteen-week-long sales course in 1991, *see* Defendant's SMF ¶ 3; Plaintiff's Opposing SMF ¶ 3.

3.      A portion of Palmieri's compensation – in some years as much as forty-five percent – derived from sales commissions. *See* Plaintiff's Opposing SMF ¶ 32.  If a sale were canceled, he lost his commission. *See* Defendant's SMF ¶ 29; Plaintiff's Opposing SMF ¶ 29.  These uncontroverted facts weighs heavily in favor of a finding that he was indeed an outside salesman. *See, e.g., Nielsen*, 302 F. Supp.2d at 757 (citing case in which court noted that "employees found to be salespersons typically earned commissions ranging from 17% to 32% of their total salaries").

4.      Palmieri was subject to very little direct supervision; in fact, his supervisor was located in an office 100 miles away from his.  Tellingly, he testified at deposition: "I approached my job as an entrepreneur.  This was my business, these were my customers, and I took full responsibility for that.  And as such, I would put in the amount of time necessary to keep my customers happy as if they were my business."  Defendant's SMF ¶ 37; Plaintiff's Opposing SMF ¶ 37.  As the *Nielsen* court

noted, "An employee who receives little or no direct or constant supervision in carrying out daily work tasks is more likely to be considered engaged in sales." *Id*. at 758.[44]

Against this backdrop, the facts highlighted by Palmieri (that he was assigned a changing stable of clients, some of which were not legitimate sales prospects and burdened him with service-related problems, and he was not free to find clients on his own) do not materially change the complexion of his job.  No reasonable fact-finder could conclude anything other than that he was an outside salesman.

I turn to the third and final prong of the outside-sales test.  As to this prong, Palmieri sharply disputes Verizon's characterization of his customer-service-related tasks as incidental to and in conjunction with his own sales.  *See* Plaintiff's S/J Opposition at 13-14.  He argues that:

1.      Verizon's assignment to him of customers with existing service issues, to whom he had no hope of making new sales, does not comport with the "incidental to" prong of the exemption. *See id*. at 13.

2.      While an occasional service-related issue presented to an outside salesman might fall within the "incidental to" prong, such issues cannot consume seventy percent of the employee's time and remain "incidental."  *See id*.

3.      Palmieri's work on customer-service issues is distinguishable from work listed in the regulations as "incidental to" sales work, *e.g*., "writing of his sales reports, the revision of his own catalog, the planning of his itinerary and attendance at sales conferences."  *Id*. at 13-14 (quoting 29

---

[44] Palmieri also cites *Jewell Tea Co. v. Williams*, 118 F.2d 202 (10th Cir. 1941), for the proposition that application of the outside-sales exemption to him runs counter to the "spirit" of the exemption. *See* Plaintiff's S/J Opposition at 12-13.  He argues that, whereas the court in *Jewell* described the rationale for the outside-sales exemption as recognition of such a salesman's ability to "earn as much or as little, within the range of his ability, as his ambition dictates[,]" *Jewell*, 118 F.2d at 207-08, he was constrained to deal with the stable of clients assigned to him whether they were good prospects or not. *See id.*  Nonetheless, the *Jewell* court also went on to observe: "In lieu of overtime, [the outside salesman] ordinarily receives commissions as extra compensation. . . .  To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman." *Jewell*, 118 F.2d at 208.  By these lights, application of the exemption to Palmieri – a high-level, high-earning (*continued on next page*)

C.F.R. § 541.503 (2002)).   Rather than supporting additional sales, Palmieri's entanglement in customer-service issues detracted from them.   *See id*.

Palmieri is correct that the spending of a high percentage of time on non-exempt tasks can militate in favor of a finding that one's job as a whole is non-exempt.   *See, e.g*., 29 C.F.R. § 541.505(a) (2002) ("The time devoted to the various duties is an important, but not necessarily controlling, element.").   However, that percentage, standing alone, is not dispositive.   *See id.; see also, e.g., Ackerman v. Coca-Cola Enters., Inc.*, 179 F.3d 1260, 1267 (10th Cir. 1999) (district court erred in holding that because merchandising work consumed between twenty to sixty-five percent of employees' work week, it could not  be characterized as incidental).   As Verizon suggests, *see* Defendant's S/J Motion at 16-17, the key determinant, for purposes of the "incidental to" prong, is whether the time in question is spent on promoting the employer's business in general or is devoted strictly to the salesman's own customers, *see, e.g.*, 29 C.F.R. § 541.504(a) (2002) ("[A]ny promotional work which is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is clearly exempt work.  On the other hand, promotional work which is incidental to sales made, or to be made, by someone else cannot be considered as exempt work.").

It is undisputed that Palmieri assisted only with the service problems of his assigned customers.   While, for purposes of summary judgment, I credit his assertion that some of those customers were not legitimate sales prospects, relevant regulations do not indicate that tasks must be fruitful in producing sales, or even that there must be a legitimate prospect of a sale at the end of the day, to be deemed "incidental to" and "in conjunction with" outside-sales work.  As Palmieri himself testified, he hoped to sell Verizon products and services to his clients.   *See* Defendant's Reply SMF ¶ 84, *qualifying* Plaintiff's Additional SMF ¶ 84.   While with respect to some of them that hope

salesman who derived a portion of his earnings from commissions – appears entirely compatible with its "spirit."

proved to be a pipe dream, to the extent that any of those clients bought additional goods or services from Verizon, he would have been credited with the sale and rewarded with the commission, if any. Beyond this, it stands to reason that as a salesman tasked with making high-level repeat sales to existing customers, Palmieri had reason to ensure that his clients received satisfactory customer service. Without assuagement of their service concerns, existing customers would not have been inclined to purchase further Verizon services or products. The question of responsiveness to service issues could not be neatly divided from that of the prospect of repeat sales. That Palmieri, whose income depended in no small part on sales commissions, did not turn a deaf ear to his clients' service complaints is understandable.[45]

To the extent that there could be any doubt as to the correct outcome of the "incidental to" prong of analysis, relevant regulations addressing the subject of promotional activities, but germane to the issue of incidental activities in general, clear it up:

> In borderline cases the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling. If his efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt. Incidental promotional activities may be tested by whether they are 'performed incidental to and in conjunction with the employee's own outside sales or solicitations' or whether they are incidental to sales which will be made by someone else.

29 C.F.R. § 541.504(b)(2) (2002). The bottom line: Palmieri's efforts were not incidental to sales that might have been made by someone else, but rather were incidental to sales that he might have made had his clients been inclined to make further purchases from Verizon. That some of them were not so inclined is immaterial.

---

[45] While Palmieri introduces evidence from which one reasonably could infer that Verizon's customer-service quality slipped rather sharply following the 1998 merger, leading his clients to demand his assistance in such matters, he does not state, nor can a reasonable inference be drawn, that Verizon literally directed him to spend up to seventy percent of his time handling such matters. While Verizon surely appreciated the obvious linkup between responsive customer service and repeat sales, there is no dispute that, at all relevant (*continued on next page*)

To summarize: Verizon bears its burden of demonstrating as a matter of law, based on the cognizable evidence as set forth above in the light most favorable to Palmieri, that at relevant times Palmieri (i) was employed for the purpose of making sales, (ii) was regularly engaged away from Verizon's place of business in making such sales, and (iii) did not spend more than twenty percent of hours he worked in the workweek on non-exempt tasks, given that his customer-service work was performed incidental to and in conjunction with his outside sales. Therefore, even if Palmieri's federal claim (Count I) were not time-barred, Verizon still would be entitled to summary judgment as regards it.

### C.  State Claim: Sales Exemption

As Verizon points out,  *see* Defendant's S/J Motion  at 9, among employees exempt from Maine's overtime-wage requirement (codified at 26 M.R.S.A. § 661 *et seq*.) are "[t]hose employees whose earnings are derived in whole or in part from sales commissions and whose hours and places of employment are not substantially controlled by the employer[,]" 26 M.R.S.A. § 663(3)(C).[46] There is no dispute that Palmieri derived his earnings in part from sales commissions. However, the parties clash over whether Verizon substantially controlled his hours and places of employment. *Compare* Defendant's S/J Motion at 9-11 *with* Plaintiff's S/J Opposition at 5-8. Again, I find that Verizon has the better of the argument.

The parties agree – and my research corroborates – that no published Maine case construes the statutory language in issue. *See* Defendant's S/J Motion at 9; Plaintiff's S/J Opposition at 6. Palmieri argues, and I concur, that under those circumstances it is appropriate to borrow from the federal FLSA analogue the concept that the employer bears the burden of proving application of an exemption. *See*

---

times, it maintained a separate customer-service department tasked not only to resolve but also to field customer-service issues.

Plaintiff's S/J Opposition at 6; *see also, e.g., Gordon v. Maine Cent. RR.*, 657 A.2d 785, 786 (Me. 1995) ("When, as here, a term is not defined in either the relevant statutory provisions or in prior decisions of this court, Maine Courts may look to analogous federal statutes, regulations, and case law for guidance.").

However, as Verizon suggests, *see* Defendant's S/J Motion at 9-10 & n.12, the substance of Maine's sales exemption differs significantly enough from that of its closest federal analogue (the federal outside-sales exemption) that federal regulations and caselaw are not helpful in construing it. Verizon posits, and I agree, that the court must fall back to Maine's basic rules of statutory interpretation. *See id.* at 9-10; *see also, e.g., Jackson Brook Inst., Inc. v. Maine Ins. Guar. Ass'n*, 861 A.2d 652, 656 (Me. 2004) ("When interpreting a statute, we seek to give effect to the intent of the Legislature by examining the plain meaning of the statutory language and considering the language in the context of the whole statutory scheme. Unless the statute itself discloses a contrary intent, words in a statute must be given their plain, common, and ordinary meaning, such as people of common intelligence would usually ascribe to them.") (citations and internal punctuation omitted).

The word "substantial" means, in relevant part: "being that specified to a large degree or in the main[.]" Webster's Third New Int'l Dictionary 2280 (1981). The word "control" means, in relevant part: "to exercise restraining or directing influence over: REGULATE: . . . DOMINATE, RULE[.]" *Id*. at 496. Thus, as Verizon contends, *see* Defendant's S/J Motion at 10, the question presented is whether Verizon dictated or commanded, to a considerable or large degree, Palmieri's location and hours of work.

As Verizon points out, *see id*. at 11, Palmieri himself testified that (i) his schedule "was dictated by the customers who were calling me complaining about service and service-related issues,"

---

[46] There has been no change in the quoted language since the relevant time period (2001-02).

and (ii) he viewed himself as an "entrepreneur," putting in the amount of time necessary to keep his customers happy. *See id.*; Defendant's SMF ¶¶ 35, 37; Plaintiff's Opposing SMF ¶¶ 35, 37. In addition, Palmieri admitted Verizon's statement that it placed few controls over his places of work. *See id.* ¶ 38.

In the face of these stark facts, Palmieri struggles to drum up a triable issue as to the substantiality of Verizon's control over his hours and place of employment. He argues that a reasonable fact-finder could resolve this question in his favor inasmuch as Verizon (i) dictated his stable of customers, depriving him of the freedom to add or drop clients at will, (ii) imposed a sales quota upon him, (iii) assigned him a mix of accounts with long-standing histories of service problems and no legitimate potential for further sales, as a result of which he spent up to seventy percent of his time on service issues and more than fifty percent of his time in the office, and (iv) obliged him to retain those accounts even after he complained that the amount of time required to deal with service issues impeded his ability to generate new sales. *See* Plaintiff's S/J Opposition at 6-7. He further observes that (i) at least two of his accounts required him to attend monthly service meetings, and (ii) supervisor Levesque admonished him to visit customers more frequently, underscoring Verizon's degree of control over his hours and place of employment. *See id.* at 7-8.

Nonetheless, as Verizon rejoins, there is fallacy in Palmieri's logic. *See* Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment, etc. (Docket No. 31) at 2-3. The statute raises the question whether the employer substantially controlled the employee's hours and places of work – not whether the employer adopted policies or made assignments that substantially influenced the manner in which the employee could conduct business (including hours and work locations). Palmieri's own testimony reveals that either he or his clients, or a combination of both, essentially "dictated" his hours and places of employment. While Verizon's sales philosophy and client

assignments impacted and circumscribed the choices Palmieri could make, Verizon plainly cannot be said to have substantially controlled his hours and places of work for purposes of section 663(3)(C).

Inasmuch as Verizon meets its burden of demonstrating the lack of any triable issue whether it is entitled to the sales exemption defined at 26 M.R.S.A. § 663(3)(C), it is entitled to summary judgment with respect to Count III.

### IV.  Conclusion

In that Palmieri has conceded Verizon's entitlement to summary judgment as to Counts II and IV of his complaint, and I find for the foregoing reasons that Verizon is entitled to prevail with respect to Counts I and III, I recommend that its motion for summary judgment be **GRANTED** in its entirety.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 28th day of March, 2005.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

30